UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | |
|---|---|
| IN RE:<br><br>James Edwards Whitley,<br><br>        Debtor. | Case No. 10-10426C-7G |
| Charles M. Ivey, III, Trustee for the Estate of James Edwards Whitley,<br><br>        Plaintiff,<br><br>vs.<br><br>Robert P. Swofford,<br><br>        Defendant. | Adversary No. 11-2039 |
| Charles M. Ivey, III, Trustee for the Estate of James Edwards Whitley,<br><br>        Plaintiff,<br><br>vs.<br><br>Faye C. Swofford,<br><br>        Defendant. | Adversary No. 11-2038 |

MEMORANDUM OPINION

These adversary proceedings came before the court on April 2, 2014, for hearing on Defendants' Motions for Partial Summary Judgment.

MATTER BEFORE THE COURT

The Plaintiff seeks in this proceeding to avoid and recover from the Defendants certain payments that the Defendants received

from the Debtor. Regarding the payments received by the Defendants within two years of the petition date, the Plaintiff asserts that such payments were fraudulent transfers under section 548(a)(1)(A) of the Bankruptcy Code. Regarding the payments received by the Defendants more than two years prior to the petition date, the Plaintiff asserts that under section 544(b) of the Bankruptcy Code the payments may be recovered as fraudulent transfers pursuant to the North Carolina Fraudulent Transfer Act, N.C. Gen. Stat. § 39-23.1, et seq.[1]

Regarding the claim under section 544(b), the Defendants assert that under the facts of this proceeding, the Plaintiff does not have standing to assert such a claim. Regarding the claim under section 548(a)(1)(A), the Defendants assert that the payments were received by the Defendants for value and in good faith and that the Defendants therefor are entitled to retain the funds pursuant to section 548(c) of the Bankruptcy Code.

I. Nature of the Plaintiff's Claims

The Plaintiff's claims rely upon the presumption of fraud that arises when a Ponzi scheme has been perpetrated.[2] According to the

---

[1] Under N.C. Gen. Stat. § 39-23.9(1), there is a four-year limitation period, while recovery under section 548 is limited to transfers made within two years of the petition date.

[2] See, e.g., In re Grafton Partners, 321 B.R. 527, 532 (B.A.P. 9th Cir. 2005); Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Grp., Inc.), 916 F.2d 528, 536 (9th Cir. 1990); Emerson v. Maples (In re Mark Benskin Co., Inc.), 1995 WL 381741, at *5 (6th Cir. 1995); Christian Bros. High Sch. Endowment v. Bayou

Plaintiff's allegations, during the period when the transactions involving the Debtor and the Defendants occurred, the Debtor presented himself to the public as owning and operating a factoring business. The Debtor engaged in promotions, including a website and direct solicitation, to promote the appearance that he was engaged in the factoring business. The Debtor enticed various individuals, including the Defendants, to loan him funds which the Debtor represented would be used in the alleged factoring business. While he was soliciting such investments, the Debtor actually was conducting little or no business activities, but continued to represent that he was doing so to his investors. To the extent that the Debtor made payments to investors as income or repayments of principal, such payments were paid from funds that the Debtor had obtained from other investors, and not from any income or profits generated from genuine business operations. The Debtor's scheme collapsed in March of 2010 when an involuntary bankruptcy case was commenced against him. Based upon the Debtor's involvement in a Ponzi scheme when he transferred the payments at issue to the Defendants, the Plaintiff maintains that there is a presumption that such payments were made by the Debtor with actual

---

No Leverage Fund, LLC (In re Bayou Grp., LLC), 439 B.R. 284, 305 (S.D.N.Y. 2010), In re Bernard L. Madoff Inv. Secs. LLC, 445 B.R. 206, 220-21 (Bankr. S.D.N.Y. 2011); In re Taneja, 453 B.R. 618, 621 (Bankr. E.D. Va. 2011); Liebersohn v. Campus Crusade for Christ, Inc. (In re C.F. Foods, L.P.), 280 B.R. 103, 110 (Bankr. D. Pa. 2002); Jobin v. Ripley (In re M & L Bus. Mach. Co., Inc.), 198 B.R. 800, 806-07 (D. Colo. 1996).

intent to defraud, and the payments may therefore be recovered under 11 U.S.C. § 548(a)(1)(A) or N.C. Gen. Stat. § 39-23.4(a)(1).

II. The Defendants' Motions for Summary Judgment

In the motions for summary judgment, the Defendants assert that there is no genuine issue of material fact regarding either the standing or good faith issues and that summary judgment should be entered in their favor pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 7056 of the Federal Rules of Bankruptcy Procedure. With regard to the Plaintiff's claim under section 544(b), the Defendants assert that the Plaintiff lacks standing to assert such a claim because the Plaintiff cannot identify an unsecured creditor who has a viable avoidance claim against the Defendants. With regard to the Plaintiff's claim under section 548(a)(1)(A), the Defendants rely upon section 548(c) as the basis for the granting of summary judgment. Solely for purposes of the summary judgment motions, the Defendants do not challenge the Plaintiff's allegation that the payments to the Defendants were made in the course of a Ponzi scheme being conducted by the Debtor such that there is a presumption that the payments were made with fraudulent intent. Thus, for the purpose of deciding this aspect of the Defendants' motions for summary judgment, it will be presumed that the payments that the Defendants received were made by the Debtor with actual intent to defraud which means that the only issues for consideration at this time regarding the claim

under section 548(a)(1)(A) are those that arise under section 548(c).

III. Analysis of Plaintiff's Standing under Section 544(b)

Section 544(b)(1) gives the trustee the power to avoid any transfer of the interest of a debtor in property that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under the Bankruptcy Code. "The burden is on the trustee seeking to take advantage of this provision to demonstrate the existence of an actual creditor with a viable cause of action against the debtor that is not time barred or otherwise invalid." 5 Collier on Bankruptcy ¶ 544.06 (16th ed. 2014). See also Bakst v. Probst (In re Amelung), 436 B.R. 806, 809 (Bankr. D.S.C. 2010); In re International Loan Network, Inc., 160 B.R. 1, 18 (Bankr. D. Colo. 1993). Under section 544(b)(1), the trustee succeeds to the rights of the unsecured creditor rather than rights of the debtor. The extent of the rights that the trustee thereby acquires is controlled by the law under which the unsecured creditor's claim arises, which may include state fraudulent conveyance law. Butler v. Nationsbank, N.A., 58 F.3d 1022 (4th Cir. 1995).

Although the Plaintiff's answers to interrogatories did not identify a specific creditor as having a viable avoidance claim against the Defendants, the Plaintiff has since done so. The creditor identified by the Plaintiff is Brent Cuddy. Mr. Cuddy filed a timely proof of claim. According to Mr. Cuddy's proof of

claim he loaned the Debtor a total of $136,500 during the period from 2007 through 2009 and never received any payments from the Debtor after doing so. In contending that Mr. Cuddy has an avoidance claim against the Defendants, the Plaintiff relies upon the North Carolina fraudulent conveyance statutes, N.C. Gen. Stat. § 39-23.1, et seq.

Under G.S. § 39-23.4(a)(1), "[a] transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . if the debtor made the transfer . . . [w]ith intent to hinder, delay, or defraud any creditor of the debtor . . . ." Under G.S. § 39-23.1(4) a "creditor" is defined as "a person who has a claim." Under G.S. 39-23.1(3), a "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Under these definitions, it would appear that Cuddy has a "claim" and therefore is a "creditor" and hence eligible to invoke G.S. 39-23.4(a)(1). The remedies available to a "creditor" with a claim under G.S. 39-23.4 are set forth in G.S. § 39-23.7 and, under section 39-23.7(a)(1), include avoidance of a fraudulent conveyance. And under section 39-23.4(a)(1), such relief is available whether the creditor's claim arose before or after the fraudulent transfers were made. Thus, Mr. Cuddy would be entitled to assert an avoidance claim against

the recipient of a fraudulent transfer from the Debtor.

The Defendants' reliance upon the doctrine of in pari delicto as a bar to the Plaintiff's claim under section 544(b) is misplaced. The in pari delicto defense is an embodiment of the principle that "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." Black's Law Dictionary, (9th ed. 2009). See also Cauble v. Trexler, 42 S.E.2d 77, 81 (N.C. 1947); Bean v. Home Detective Co., 173 S.E. 5 (N.C. 1934). The claim against the Defendants under N.C. Gen. Stat. § 39-23.1 is based upon the Defendants being simply recipients of a transfer involving fraud on the part of the Debtor. There is no allegation or requirement of "wrongdoing" on the part of the Defendants. In short, there is no allegation of wrongdoing that could have been participated in by Mr. Cuddy. The Defendants have cited no court decisions that would support the applicability of the in pari delicto defense under such circumstances.

Moreover, even if the in pari delicto defense were theoretically available, the Defendants have failed to supply a factual basis for its application. In pari delicto is an affirmative defense that must be established by the party asserting it. See, e.g., Official Comm. of Unsecured Creditors v. Lafferty & Co., Inc., 267 F.3d 340, 346 (3d Cir. 2001); Logan v. JKV Real Estate Servs. (In re Bogdan), 414 F.3d 507, 518 n. 2 (2005) (King, J., dissenting); see also Grayson Consulting, Inc. v. Wachovia

Securities, LLC (In re Dervivium), 716 F.3d 355, 366-67 (4th Cir. 2013). Where, as here, the movant seeks summary judgment on an affirmative defense, the movant must conclusively establish all essential elements of that defense. Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc., 673 F.3d 294, 299 (4th Cir. 2012) (citing Celotex v. Catrett, 477 U.S. 317, 331, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The Defendants have made no such showing. There is no evidence of any wrongdoing on the part of Mr. Cuddy. To the contrary, the only evidence regarding Mr. Cuddy is that he made a loan to the Debtor and that, unlike the Defendants, he has never received any payments from the Debtor. Mr. Cuddy filed a timely proof of claim seeking repayment of the loan extended to the Debtor. No objections to his proof of claim have been filed. Under Bankruptcy Rule 3001(f), the proof of claim remains prima facie evidence of the validity and amount of the claim.

Based upon the foregoing, the court concludes that the Plaintiff has identified an unsecured creditor who satisfies the requirements of section 544(b) and that the Defendants' motions for summary judgment as to the claim under section 544(b) therefore should be overruled and denied.

IV. Analysis of Good Faith under Section 548(c)

Under section 548(c), a transferee "that takes for value and in good faith has a lien on or may retain any interest transferred . . . to the extent that such transferee . . . gave

value to the debtor in exchange for such transfer. . . ." Section 548(c) functions as an affirmative defense in a fraudulent conveyance proceeding with the result that the defendant/transferee has the burden of proving both the value and the good faith elements of section 548(c). E.g. Breeden v. L.I. Bridge Fund, LLC (In re Bennett Funding Grp., Inc.), 232 B.R. 565, 573 (Bankr. N.D.N.Y. 1999)("[Section 548(c)] has been construed as an affirmative defense, all elements of which must be proven by the defendant-transferee."). To meet this burden, the evidence relied upon by the Defendants must be sufficient to satisfy the legal requirements of "value" and "good faith," as those terms are utilized in section 548(c).

As many courts and commentators have noted, the Bankruptcy Code does not provide a definition of "good faith." While most courts have not attempted to provide a precise definition of the phrase, courts have formulated various principles and criteria for use in determining whether a transfer was received in good faith for purposes of section 548(c). See In re Telesphere Commc'ns, Inc., 179 B.R. 544, 557 (Bankr. N.D. Ill. 1994)("the courts have varied widely in the general approach they have taken in deciding questions of good faith in the context of fraudulent conveyance law"). While the principles and criteria that have been adopted vary from case to case, they do agree that good faith should be determined on a case-by-case basis and based upon the particular

circumstances of each case. E.g., Brown v. Third Nat'l Bank (In re Sherman), 67 F.3d 1348, 1355 (8th Cir. 1995)("Good faith is not susceptible of precise definition and is determined on a case-by-case basis.").

In deciding upon the principles or criteria that the court should apply in this proceeding, the court begins with the case of Gold v. First Tennessee Bank N.A. (In re Taneja), 743 F.3d 423 (4th Cir. 2014), the most recent discussion of good faith by the Court of Appeals for the Fourth Circuit, and the case of Goldman v. Capital City Mort. Corp. (In re Nieves), 648 F.3d 232 (4th Cir. 2011), the Court's most extensive discussion of good faith. Although the good faith issue in Nieves arose under section 550(b)(1)[3], the court in Taneja held that "the good-faith standard adopted in In re Nieves is applicable to the establishment of a good-faith defense under Section 548(c)." Id. at ___. The Court stated that "in In re Nieves, we determined that the proper focus in evaluating good faith in the context of a bankruptcy avoidance action requires that a court determine 'what the transferee [actually] knew or should have known' when it accepted the transfers." Id. (quoting Nieves at 238). Further summarizing the Nieves decision, the Court continued "we concluded that 'good

---

[3]Under section 550(b)(1), a trustee may not recover an avoided transfer from an immediate or mediate transferee "that takes for value, . . . in good faith, and without knowledge of the voidability of the transfer avoided . . .."

faith' has both a '[1] subjective ("honesty in fact") and [2] objective ("observance of reasonable commercial standards") components.'" Id. (quoting Nieves at 239).

The decision in Nieves is instructive regarding the manner in which the foregoing standard should be applied in this proceeding. In Nieves, the Court approved a two-step approach to determining whether a transferee received a transfer in good faith. This approach involved first determining whether the defendant was placed on inquiry notice by the facts known to the transferee and, secondly, upon finding that such facts were present, then determining whether a reasonable inquiry would have disclosed the voidability of the transfer at issue. Regarding the first component, the court held that "the bankruptcy court applied the correct legal standard of objective good faith and we affirm as not clearly erroneous its factual finding that the facts known to CCM would have lead 'a lender under the circumstances of this case [to] inquire as to the record.'" (emphasis by the Court) Nieves, 648 F.3d at 241.[4] Regarding the second component, the court stated that "[h]ad CCM conducted a reasonable search it would have discovered a number of facts pointing toward the voidability of the transfers." Id. at 242.

---

[4]Even though the Court emphasized that the facts known to the defendant were determinative in deciding whether an inquiry was required, the court also cautioned that a transferee cannot "willfully turn[] a blind eye to a suspicious transaction" and then have the benefit of the good faith defense. 648 F.3d at 242.

Under the decisions in Taneja and Nieves, whether an inquiry regarding a transfer is required in determining good faith under section 548(c) depends upon the facts that were known by the transferee when the transfer was received and that a reasonable inquiry is the standard when a transferee is on inquiry notice. Consistent with Nieves and Taneja, if (1) the circumstances known to the transferee would place a reasonable person on notice that the transfer might be fraudulent, and (2) a diligent inquiry would have discovered the fraudulent purpose, then there is a lack of good faith on the part of the transferee. In accord, Jobin, 84 F.3d at 1338. Under this standard, an objective, reasonable person standard applies to both the inquiry notice and the diligent investigation components of the good faith test. Jobin, 84 F.3d at 1334-35 (expressly rejecting a subjective standard under which a transferee would not lack good faith unless he had actual knowledge of the fraudulent nature of the transfer). In this proceeding, application of the objective standard means that the first component of the above-described test will be governed by the facts that were actually known by the Defendants when the payments were received from the Debtor, and whether such circumstances would have placed a reasonable person on notice that the payments might be fraudulent. If a reasonable person would have been on notice, the relevant question then becomes whether an inquiry, if made with reasonable diligence, would have led to the discovery of the

fraudulent nature of the payments. Id. at 316; Wiand v. Waxenberg, 611 F.Supp.2d 1299, 1319-20 (M.D. Fla. 2009).

V. Summary Judgment Standard in This Proceeding

Where, as in this proceeding, the moving party has the burden of proof at trial, the standard for granting summary judgment is more stringent. Nat'l State Bank v. Fed. Reserve Bank, 979 F.2d 1579, 1582 (3rd Cir. 1992). See also Ray Comm. v. Clear Channel Commc'n, Inc., 673 F.3d 294, 299 (4th Cir. 2012)("Where, as here, the movant seeks summary judgment on an affirmative defense, it must conclusively establish all essential elements of that defense."). Where the movant has the burden of proof, the summary judgment standard mirrors the standard applicable when a trial court is ruling on a motion for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure. See 9 James Wm. Moore et al., Moore's Federal Practice ¶ 50.06[6][b] (3d ed. 2012)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986)(motion for summary judgment standard "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)")). The standard in this proceeding, therefore, is the same as the standard for determining whether a judgment may be directed under Rule 50 in favor of a party with the burden of proof. As the Fourth Circuit explained in Sales v. Grant, 155 F.3d 768, 775 (4th Cir. 1998), under the applicable standard the non-moving party "must be given the benefit of every

reasonable inference that could be drawn from the evidence, neither weighing the evidence nor assessing its credibility" and the motion can be granted "only if, by [such] assessment, the only conclusion a reasonable jury could draw from the evidence" is in favor of the moving party. The motion must be denied if "reasonable minds could differ as to the conclusion to be drawn from the evidence." Id.; See 9 Moore et al., ¶ 50.05[2] n.6 ("granting judgment for party with burden of proof possible only when evidence favoring movant is overwhelming").

    VI.   Analysis of the Evidence Related to Good Faith

The Defendants rely heavily upon their affidavits in support of their motion for summary judgment. According to the affidavits: the Defendants began investing with Ed Whitley in the early 1990's. The dealings between the Defendants and the Debtor were handled by the male Defendant ("the Defendant"). A loan of approximately $10,000 was extended at that time which was reflected by a promissory note and repaid in a timely fashion. The interest rate was two percent per month. The Debtor told the Defendant that he factored receivables and that he also factored purchase orders which gave a higher rate of return. The Defendant had dealt with factors in his own businesses and at times had been charged more than the two percent per month offered by the Debtor. The Defendants did not make any loans to the Debtor after about 1993 until 2001. In 2001, The Defendants loaned the Debtor $20,000. In

2002, they loaned the Debtor an additional $50,000 and then another $30,000, all at two percent per month. These initial loans totaling $100,000 were rolled into a promissory note in 2004 when the Defendants loaned an additional $250,000. The promissory note was in the principal amount of $350,000. Before the Defendant advanced this additional money in 2004, he asked the Debtor to provide him with some financials for his business. In response to this request, the Debtor showed the Defendant a customer list and a tax return for his company, South Wynd financial, Inc. The tax return appeared to show a profit of close to $600,000 and looked like to the Defendant that the loans would be a good investment. Between October 2005 and February 2009, the Defendants loaned the Debtor at least an additional $1,440,000. All sums loaned were evidenced by promissory notes. In general, the notes were renewed annually and had an interest rate of two percent per month. Occasionally, the interest rate would be higher for a short term loan when the Debtor said he was financing purchase orders on a short term basis. In general, the Debtor made the payments promised on time or within 30 days. In June 2008, the Defendants did not offer the Debtor a one-year renewal. The Debtor was made aware that the Defendants had borrowed on their bank lines of credit to make loans to the Debtor and that their bank notes came due annually. The Defendants told the Debtor that they needed him to begin repayment of the loans because they were approaching

seventy years of age and also they needed to repay $750,000 they had borrowed in order to make their loans to him. At that time, the Defendants had $975,000 of outstanding loans to the Debtor and when they met with the Debtor in July of 2008 to discuss repayment they decided to separate the outstanding indebtedness into a $375,000 note to the female Defendant and a $600,000 note to the male Defendant for estate planning purposes. The interest rate under these notes was increased to three percent per month in an effort to encourage early payment by the Debtor. Later these notes were further modified so that the Debtor could pay off part at a time, and the repayment dates for the notes were staggered. The Defendants had no suspicions regarding the Debtor until late 2009 or early 2010 when some of his Bald Head Island investors began to investigate him.

There is evidence before the court from which a jury could find that an inducement offered by the Debtor to obtain investors was an arrangement under which he did not report the interest paid to his investors to the Internal Revenue Service. As the Debtor described the situation, he never sent any Form 1099's and no one ever requested any. The result of such arrangement is that investors with the Debtor could receive substantial amounts of interest from the Debtor without reporting the interest income or paying any income tax on the interest. This means that in reality investors could realize a significantly larger return on their

investment than their annual interest rate of twenty-four percent or more. Construing the evidence in the light most favorable to the Plaintiff as is required at this juncture, a reasonable inference can be drawn that the Defendants were a part of this arrangement.[5] Viewed in the most charitable light, such an arrangement is irregular and one which a jury could find would prompt a careful investigation by a reasonable and honest investor as to the legitimacy of the person or company offering such an arrangement and the returns being offered by such a person or company. When this highly irregular circumstance and other circumstances in this case such as the Debtor not having an office or place of business or any employees and the fact that checks to and from the Debtor were personal checks and not to or from his business are examined under the standard articulated in Sales v. Grant, the court does not find that the only conclusion that a jury could draw would be in favor of the Defendants. The situation, instead, is one in which reasonable minds could differ as whether

---

[5]According to the affidavits and the exhibits submitted by the Defendants, they loaned the Debtor a total of $1,440,000 between October of 2005 and June of 2008. The Defendants rolled over the principal of the loans until the first part of 2008. It is a reasonable inference from the record that during that period the Debtor made regular payments of interest to the Defendants and that such payments were substantial. For example, there is evidence that between 2006 and 2009 the Debtor paid at least $969,653.68 to the male Defendant plus at least $124,500 to the female Defendant for total payments of $1,094,153.68. Despite such payments, the Defendants admit that they reported no interest income from the Debtor in any of the income tax returns they filed prior to 2010.

the Defendants made a reasonable investigation based upon the facts and circumstances known to the Defendants and as to whether a reasonable investigation would have disclosed the Debtor's investment scheme. The Defendants, therefore, are not entitled to summary judgment with respect to the good faith issue.

VII. Analysis of the Value Requirement under Section 548(c)

A good faith transferee can prevent the avoidance of a challenged transfer under section 548(a)(1)(A) or N.C. Gen. Stat. § 39-23.1 by demonstrating that he took the transfer in exchange for value. "Value" is defined both in the Bankruptcy Code and under the North Carolina Fraudulent Transfer Act to include a transfer in exchange for the satisfaction of an antecedent debt. N.C.Gen.Stat. § 39-23.3(a); 11 U.S.C. § 548(d)(2)(A). In the case of Ponzi schemes, the general rule is that a defrauded investor gives "value" to a debtor in exchange for payments that in the aggregate do not exceed the principal amount of the investment, but not as to any payments in excess of principal. Perkins v. Haines, 661 F.3d 623, 627 (11th Cir.2011); Donell v. Kowell, 533 F.3d 762, 770 (9th Cir. 2008); Scholes v. Lehmann, 56 F.3d 750, 757-58 (7th Cir. 1995). Under a concept referred to as the "netting rule" most courts determine the liability of an investor in a Ponzi scheme by comparing the amount of a defendant's principal investment with the aggregate amount received in return on the investment. See Donnell, 533 F.3d at 770. An investor who receives a positive

return on investment is liable under the fraudulent conveyance statute for any amount received in excess of the investor's principal investment, regardless of whether the investor received the payments in good faith, because payments in excess of principal are not made for value. Id. Where payments received by a defendant in good faith do not exceed a defendant's principal investment however, these payments are supported by value and a defendant is entitled to retain the amounts under 11 U.S.C. § 548(c). See In re Lake States Commods., Inc., 253 B.R. 866, 872 (Bankr. N.D. Ill. 2000) (collecting cases).

According to the Defendants' affidavits, between October of 2005 and June of 2008, they invested or loaned the Debtor a total of $1,440,000. The record reflects that between 2006 and 2009, the Defendants received payments from the Debtor totaling $1,094,153.68. There is insufficient evidence, however, as to the amount of the payments they received from the Debtor prior to 2006. Under these circumstances, the court concludes that there is a material issue of fact regarding whether and to what extent the Defendants "gave value" under section 548(c). The court cannot determine from the record now before the court whether the Defendants are net winners or net losers because the total amount transferred by the Debtor to the Defendants is not reflected in the record before the court. Although a court may not require a defendant/transferee to disgorge profits received outside the

applicable statute of limitations, the court must nevertheless net the total amount transferred by the debtor to the defendant/transferee against the amounts invested by the defendant/transferee in order to assess the defendant's liability. See Donell v. Kowell, 533 F.3d at 771 (court must first determine whether a defendant is liable based on all transfers received, and then determine the extent of the defendant's liability in light of factors such as the statute of limitations and good faith). In this case the court is presented with a request for summary judgment in which there is missing information regarding the payments received from the Debtor by the Defendants. The Defendants, therefore, are not entitled to summary judgment with respect to the value requirement under section 548(c).

VI. Conclusion

Based upon the foregoing, the court concludes that the Defendants' motions for summary judgment should be denied both as to whether the transfers from the Debtor were received in good faith and as to whether the Defendants gave value for the payments received from the Debtor. An order so providing shall be entered contemporaneously with the filing of this memorandum opinion.

This 7th day of May, 2014.

/s/ William L. Stocks
WILLIAM L. STOCKS
United States Bankruptcy Judge